SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

New York Telephone Co., et al., Mountain States Telephone & Telegraph Co., et al., Bell Atlantic Telephone Companies, Intervenors.

No. 84–1638.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1985.

Decided Jan. 17, 1986.

As Amended Jan. 17, 1986.

Michael A. Tanner, with whom Vincent L. Sgrosso and Frederick W. Johnson were on brief for petitioner.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Com'n, with whom Jack D. Smith, General Counsel, Daniel M. Armstrong, Associate General Counsel, Jane E. Mago, Counsel, Federal Communications Com'n, Catherine O'Sullivan and Andrea Limmer, Attys., Dept. of Justice were on brief for respondents.

Robert B. McKenna, Robert W. Barker and Luisa L. Lancetti were on brief for intervenors Mountain States Tele. & Tel. Co., et al.

Saul Fisher entered an appearance for intervenor New York Telephone Co., et al.

Before WALD, MIKVA and GINSBURG, Circuit Judges.

WALD, Circuit Judge:

Petitioner Southern Bell Telephone and Telegraph Company ("Southern Bell") challenges an order of the Federal Communications Commission ("FCC" or "Commission") prescribing depreciation rates. In 1983, the Commission set Southern Bell's depreciation rates in accordance with the "remaining life" method first adopted in a 1980 rulemaking. Southern Bell had requested higher depreciation rates based on a method which would more rapidly write down depreciation reserve deficiencies accumulated during previous years. We hold that the FCC's decision to adhere to the remaining life depreciation method for Southern Bell was proper, even when considered in conjunction with the Commis-

sion's subsequent decision to allow another company to use a different depreciation methodology. The petition for review is accordingly denied.

## I. BACKGROUND

### A. *Docket 20,188*

The FCC is required to prescribe depreciation rates for telephone common carriers as part of its broader rate making responsibilities under the Communications Act of 1934. 47 U.S.C. § 220(b) (1982). Depreciation charges allow telephone companies to include in their operating expenses a percentage of their investment in equipment and facilities used to provide telephone service. These charges represent the property's loss of value due to known causes including wear and tear, obsolescence, changes in technology, and changes in demand. *See* 47 C.F.R. § 31.01–3(n) (1985). Depreciation charges, accumulated in an account known as the depreciation reserve, are among the expense elements included in a telephone company's revenue requirement, which is the basis for determining the rates that the FCC (and state regulatory bodies) will authorize the company to charge its customers.

In 1980 the Commission adopted major changes in the way depreciation rates were to be calculated. In response to changes in competitive and technological conditions in the market for telephone services, the FCC authorized the use of "equal life group" ("ELG") depreciation accounting for all new plant acquisitions. *Amendment of Part 31*, 83 F.C.C.2d 267, 280–81 (1980), *reconsideration denied*, 87 F.C.C.2d 916 (1981) [hereinafter cited as *Docket 20,188*]. On reconsideration, the Commission emphasized that the use of ELG was necessary to bring depreciation accounting "more in line with today's technology and economic conditions" and "to improve capital recovery promptly in light of competitive and technological conditions in the marketplace." 87 F.C.C.2d at 918–19.

The FCC also adopted the "remaining life" method of accounting for correcting errors made in estimating the useful life of both embedded and new plant. *Docket 20,188*, 83 F.C.C.2d at 288–90. Under the previous "whole life" method, depreciation charges were calculated each year as if the useful life of the asset had been estimated correctly from the beginning. Under the remaining life method, when new information leads to a different estimate of the asset's useful life, the remaining unrecovered depreciation is allocated over the actual remaining life, so that 100% of the asset's value is depreciated.[1]

The Commission adopted the remaining life method in recognition of depreciation reserve deficiencies which had developed under whole life accounting. Beginning in the late 1960's, asset lives had consistently turned out to be shorter than the original estimates, creating depreciation reserve deficiencies which, the FCC found, would continue to grow absent corrective action. *Docket 20,188*, 83 F.C.C.2d at 289–90. The Commission acknowledged that responding to these deficits by using the remaining life method "might result in sharp increases in revenue requirements and in user charges," but concluded that such changes were necessary:

> With respect to telecommunications investment, the impact of new technology and the transition from a monopoly to a competitive environment have led to an

---

**1.** The Commission's brief provides a useful illustration of the differences between the two methods. FCC Br. at 7–8. Assume that an asset has been depreciated for three years at 10% a year, based on the assumption that its useful life is 10 years. After three years, when 30% of its value has been depreciated, the estimate of its useful life is reduced to five years (perhaps due to technological changes hastening its obsolescence). Under the whole life method, the Commission pretended that the five year life had been used all along, resulting in a depreciation rate of 20% for the last two years. Using whole life accounting, only 70% of the asset would ever be depreciated, creating a depreciation reserve deficiency. Under the remaining life method, however, a carrier can capture any unrecovered depreciation over the corrected remaining life of the asset. In this example, the depreciation rate for the last two years of the asset's life would be 35% and the asset's entire value would be depreciated at the end of five years.

overall shortening of life estimates.... Absent a reversal of current trends and without corrective action, the amount of difference due to errors of life estimate will continue to grow, and upon ultimate retirement the reserve provisions will not be adequate.

*Id.* at 290. The adoption of the remaining life method was not challenged in any of the petitions for reconsideration, *see* 87 F.C.C.2d 916, nor was Docket 20,188 challenged in court.

### B. *The Southern Bell Proceeding*

The Commission generally conducts informal adjudications each year to prescribe depreciation rates for one-third of the regulated telephone companies. Southern Bell was included in the third and final group of companies to have their depreciation rates set based on the remaining life and other methods adopted in Docket 20,188. The company's initial filing reflected its concern over the size of its depreciation reserve deficiency, Joint Appendix ("J.A.") at 214–22, estimated at between $1.7 and $2.7 billion, *id.* at 217. After its proposed depreciation rate of 9.2% was rejected by the staffs of the FCC and state commissions in a three-way meeting,[2] Southern Bell submitted alternative proposals to reduce its deficiency either by (1) applying the ELG method to embedded plant rather than just plant additions or (2) adjusting the staff's proposed rate of 7.3% upward to 9.3% to correct for its reserve shortfall. J.A. at 167–69.

The Commission accepted the staff's proposed rate of 7.3% and rejected the argument, pressed in this appeal, that recovery beyond that afforded by remaining life depreciation is necessary for timely elimination of depreciation reserve deficiencies.

The Commission first generally reaffirmed, as it had in the two previous prescription orders, its choice of remaining life rates as the way to "true-up" existing reserve deficiencies. *Order*, 96 F.C.C.2d at 263–64. The Commission then rejected the arguments of the Bell Operating Companies, including Southern Bell, that the remaining life method would not eliminate the depreciation reserve deficiencies quickly enough. *Id.* at 264–67. The Commission specifically rejected the position of several telephone companies and state commissions that reserve deficiencies should be recovered by amortizing them over a period other than the remaining life. *Id.* at 266–67.

Southern Bell petitioned the Commission for reconsideration, arguing that the rates set by the Commission were not appropriate to the newly competitive environment in which it was operating and would increase the risk of "bypass"[3] of the local network by large customers. J.A. at 33–41. The Commission rejected Southern Bell's arguments, finding that the proposed remaining life rates would result in timely reduction of the reserve deficiencies and would not encourage uneconomic bypass. *Prescription of Revised Percentages of Depreciation*, FCC 84–505 (Oct. 31, 1984), *reprinted in* J.A. at 1, 5–6 [hereinafter cited as *Order on Reconsideration*].

### C. *The Illinois Bell Proceeding*

Two months after its decision denying reconsideration of Southern Bell's depreciation rates, the Commission began the second round of revisions to depreciation rates following Docket 20,188. In its 1984 prescription order, the Commission authorized Illinois Bell to amortize most of its reserve deficiencies over a five year period, rather than making up the deficiencies using re-

---

**2.** The Commission prescribes depreciation rates following a procedure which includes a "three-way meeting" in which the company's proposed rates and the FCC staff's preliminary proposals are evaluated by representatives of the company, the FCC staff, and the staffs of the appropriate state commissions. *Prescription of Revised Percentages of Depreciation*, 96 F.C.C.2d 257, 261 (1983), *reprinted in* J.A. at 42 [hereinafter cited as *Order*].

**3.** The FCC's *First Bypass Report* defines bypass as "the use of communications facilities or services (video, voice, or data) which go around the local telephone exchanges of the public switched network." *First Bypass Report*, app. F at 5 (1983), *reprinted in* Southern Bell Br. at app. B.

maining life depreciation rates. Like Southern Bell, Illinois Bell argued that accelerated recovery was necessary because the company would "be in a fully competitive environment in the foreseeable future, driving prices to marginal costs and leaving no revenues to cover reserve deficit depreciation through the remaining-life method." 49 Fed. Reg. 49,906, 49,909 (1984). The Commission's decision to allow amortization relied heavily on the Illinois Commerce Commission's assessment of the competitive environment faced by Illinois Bell and the effects of higher depreciation charges on Illinois ratepayers. *Id.* at 49,910. Although the FCC reaffirmed that "the remaining-life method is generally adequate to assure full and timely recovery of existing reserve deficits," it concluded that in the future it would entertain requests to use amortization if the company's request was supported by the appropriate state regulatory commission. *Id.*

## II. Analysis

Southern Bell primarily advances two arguments on appeal.[4] First, the company contends that the depreciation rates prescribed by the FCC deprive it of a reasonable opportunity to recover its depreciation deficits. The company's argument is that remaining life rates will push recovery far into the future, at which time intense competition will make rate increases impossible without causing large customers to bypass its system. Second, Southern Bell complains that the Commission's decision to allow Illinois Bell to amortize its depreciation deficits is inconsistent with the decision in this case and improperly requires the concurrence of state regulatory bodies. We consider each of these arguments in turn.

4. Any arguments raised by petitioners but not addressed in this opinion have been considered and found to be lacking in merit.

5. While these opinions deal with depreciation ratemaking under the Natural Gas Act, most ratemaking statutes contain substantially similar provisions. *Compare Memphis Light,* 504 F.2d at 228–29 *to* 47 U.S.C. § 220(b) (1982) *and* 47 C.F.R. § 31.01–3(n) (1985). Accordingly, this court has held that the principles of judicial

### A. *The Southern Bell Proceeding*

▬ This court must affirm the depreciation rates set by the FCC as long as they fall within a "zone of reasonableness." Depreciation rates will be upheld if the Commission has articulated "some rational connection between the facts found, supported by substantial evidence, and the action which it took." *Memphis Light, Gas & Water Division v. FPC,* 504 F.2d 225, 230 (D.C.Cir.1974); *see also South Dakota Public Utilities Commission v. FERC,* 668 F.2d 333, 337 (8th Cir.1981) (following *Memphis Light* ).[5] As always, we will accord substantial deference to the Commission when reviewing its ratemaking decisions. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968).

Depreciation rates obviously do not fall within a zone of reasonableness if they are so low as to be constitutionally confiscatory. The Commission and Southern Bell both agree that, to avoid problems of confiscation, depreciation rates must provide the company with a "reasonable opportunity" to recoup its past investment. Southern Bell claims that remaining life rates do not provide such an opportunity because they push recovery as far as thirty years into the future. By then, the company contends, competition will have altered the marketplace for telephone services such that a telephone company will be limited to charging marginal rates based on current costs; any rates including other components (such as deferred depreciation) will be so high as to induce large customers to bypass use of the local telephone company. Southern Bell therefore charges that "[t]he Commission's failure to order the timely

review of agency ratemaking are generally applicable to all agencies, including the FCC. *Las Cruces TV Cable v. FCC,* 645 F.2d 1041, 1046–47 (D.C.Cir.1981). Those principles of review include the Supreme Court's admonition that "courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.'" *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (citation omitted).

elimination of the reserve deficiency is denying Southern Bell an opportunity for full capital recovery and will lead to the unconstitutional confiscation of the Company's property." Southern Bell Br. at 14.

The FCC's prescription order acknowledged the telephone companies' argument that the remaining life method shifts recovery too far into the future but rejected it, reaffirming that "remaining-life rates for embedded plant will assure the attainment of 100% capital recovery, the same result that would ensue" from the use of the companies' proposed use of equal life group ("ELG") rates for embedded plant. *Order*, 96 F.C.C.2d at 265–66. Similarly, on reconsideration the FCC reaffirmed that remaining life rates would result in the timely elimination of reserve deficiencies. *Order on Reconsideration*, J.A. at 5–6. Furthermore, the proposed alternatives to remaining life—application of ELG rates to embedded plant and amortization—were found to create too much volatility in rates in the near term, possibly leading to uneconomic bypass in the immediate future. *Order*, 96 F.C.C.2d at 266; *Order on Reconsideration*, J.A. at 6.

■ The Commission's conclusion that remaining life rates will result in the timely recovery of the deficits is reasonable and supported by substantial evidence in the record. A staff analysis indicates that the bulk of the deficits will be recovered in the first few years after full implementation of remaining life rates. Memorandum from Gary M. Epstein Regarding Commissioner Fogarty's Capital Recovery Reform Proposal at 3–6 (May 16, 1983), *reprinted in* FCC Br. as Attachment B [hereinafter referred to as Epstein Memo].[6]

Furthermore, the Commission noted on reconsideration that, contrary to Southern Bell's arguments, uneconomic bypass could be a problem in the near term which could be exacerbated by an acceleration in recovery of the depreciation deficits beyond that provided by remaining life rates. *Order on Reconsideration*, J.A. at 6. This position on bypass was taken by a staff member at the Georgia commission, J.A. at 28, and by an FCC staff analysis, Epstein Memo at 2 ("the bypass problem could in the short run be exacerbated by further significant increases in local carrier expenses and therefore rates"). Indeed, even the FCC study on bypass cited by Southern Bell indicates that bypass may be a problem in the next three to five years, Southern Bell Br. at 18–19, undercutting the company's assertion that it "has a window of about five years within which to recover its deficiency," Southern Bell Reply Br. at 3. The Commission's position on the danger of bypass in the short-term is also consistent with its finding in the prescription order that the alternative depreciation methods proposed by the telephone companies "would introduce an unjustified volatility of depreciation expenses and, thus, overall rate levels." *Order*, 96 F.C.C.2d at 266.

■ The heart of the dispute between Southern Bell and the Commission is whether the reserve deficits should be recovered primarily in the next few years, posing a risk that recovery of the deficits will itself cause bypass, or recovered over the full remaining life of the assets, posing a risk of non-recovery due to the threat of bypass in the longer run. This is precisely the type of factual and policy dispute which must be resolved by agency expertise rather than this court.[7] We hold that the

---

**6.** Although Southern Bell criticizes the FCC for relying on the Epstein memo because it was not in the record of the prescription proceeding, Southern Bell Reply Br. at 15, both the Epstein memo and the memo from Commissioner Fogarty to which it replied were public at the time of the prescription proceeding and were commented on by the parties to the proceeding, FCC Br. at 18 n.26. Given Southern Bell's reliance on the Fogarty memo in both its initial comments and petition for reconsideration, and the company's point-by-point rebuttal of the Epstein memo in its comments, J.A. at 36–37, 109–118,

Southern Bell can hardly complain that the Commission improperly relied on these two memos.

**7.** Indeed, a dispute still rages over the extent of the bypass threat in the short and long run, the degree of variation in bypass activity in different states, and the relationship of rates to bypass. *See generally Telecommunications Bypass: Empirical Estimates and Regulatory Policy Issues,* in The Impact of Deregulation and Market Forces on Public Utilities: The Future Role of Regulation 57–136 (1985).

FCC's conclusions that remaining life depreciation rates will result in timely recovery of Southern Bell's deficit and that a more accelerated method of depreciation for the company poses a significant risk of bypass are neither arbitrary nor capricious. *See* 5 U.S.C. § 706(2)(A) (1982).

 Further, as the Commission notes, Southern Bell has effectively asked for a waiver of the general depreciation rules adopted in Docket 20,188.[8] In that rulemaking, the Commission noted that companies that wished to propose new or alternative methods of calculating depreciation rates had the "burden of demonstrating that any particular method is both reasonable and practicable" and cautioned that alternative methods "generally are more suited for application to prospective property additions, rather than application to presently embedded plant." *Docket 20,188*, 83 F.C.C.2d at 287. The Commission thereby created a system where, as with waivers, an applicant "faces a high hurdle even at the starting gate." *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969). And, like a petitioner seeking judicial review of an agency's denial of a waiver, Southern Bell must convince this court "that the agency's reasons for declining the waiver were 'so insubstantial as to render that denial an abuse of discretion.'" *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.1983) (footnote omitted).

While Southern Bell has criticized the remaining life method, it has not made a showing that its proposed alternatives are both reasonable and practical. Absent this showing, Southern Bell has failed to discredit the FCC's decision to adhere to the remaining life method of calculating depreciation rates as an abuse of discretion.

### B. *Consistency with Illinois Bell*

 Southern Bell also argues that the reasonableness of the FCC's decision to apply remaining life rates is undercut by the Commission's subsequent decision to allow Illinois Bell to amortize its depreciation reserve deficiencies over five years. Even when granting waivers, an agency must treat like cases similarly or explain its disparate treatment. *Airmark Corp. v. FAA*, 758 F.2d 685, 691–92 (D.C.Cir.1985); *see also Public Media Center v. FCC*, 587 F.2d 1322, 1331 (D.C.Cir.1978) (FCC must explain differences between broadcast licensees and the relevance of those differences to the Communications Act). Because the FCC conceded at oral argument that the only substantive difference between Southern Bell and Illinois Bell was that Illinois Bell's request had the concurrence of the state regulatory body, we must decide whether the Commission can require a telephone company to have such concurrence before it will consider allowing amortization of the reserve deficit.

---

**8.** Several telephone companies which have intervened before this court seek much more than a waiver of the methods adopted in Docket 20,188; charging that reserve deficits are a nationwide problem, they contend that the FCC must switch from remaining life depreciation rates to amortization of reserve deficits in all cases. The intervenors complain that the FCC's decision to address reserve deficiency problems on an *ad hoc* basis leaves telephone companies such as themselves "in a state of confusion," although in the same paragraph they concede that the Commission has sent out a "clear message ... that the remaining-life method of depreciation deficiency recovery ... represents FCC policy in this area." Intervenors' Br. at 4. They charge that the FCC's decision "to proceed on a 'case-by-case basis' in this area ... amounts to an inadequate response which this Court should undertake to correct." *Id.* at 11. This court has, however, recently reiterated that "the

decision whether to proceed by rulemaking or adjudication lies within the broad discretion of the agency." *Wisconsin Gas Co. v. FERC*, 770 F.2d 1144, 1166 (D.C.Cir.1985) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947)). While we must normally defer to an agency's decision to proceed on a case-by-case basis, the telephone companies themselves can urge the agency to switch to a rulemaking approach, especially if they believe that "[t]he FCC must resolve, on a national basis, the depreciation reserve deficiency problem by adoption of a uniform policy." Intervenors' Br. at 11. The telephone companies, having chosen neither to challenge Docket 20,188 nor to petition the FCC for a subsequent rulemaking, are not well positioned to ask this court to order the Commission to institute a new, nationwide policy on depreciation reserve deficiencies in the context of reviewing a single adjudication.

■ The Commission generally has the authority to set threshold requirements for applicants seeking waivers or variances from generally applicable rules. *See North Texas Media, Inc. v. FCC,* 778 F.2d 32–33 (D.C.Cir.1985). In the Illinois Bell proceeding the Commission chose to make a state regulatory body's support of an amortization proposal a necessary, but not sufficient,[9] condition for deviation from the remaining life method adopted in Docket 20,188. 49 Fed.Reg. 49,906, 49,910 (1984). The FCC's reliance on state commission assessments of local competitive conditions and the effects of higher rates in each state is reasonable and consistent with the Communications Act. The Act requires the Commission to receive and consider the views of state commissions before it prescribes depreciation rates. 47 U.S.C. § 220(i) (1982). Because the FCC has preempted inconsistent state depreciation methodologies, the Act's mandate of state participation in depreciation ratemaking can only be fulfilled by giving states a role in the FCC's setting of depreciation rates.[10]

■ While Southern Bell would undoubtedly have preferred the Commission to announce its new policy on amortization in the 1983 prescription order, the Commission's only obligation when changing its policies is to provide an explanation at the time of the change. This obligation was fulfilled in the *Illinois Bell* order. *See* 49

Fed.Reg. at 49,909–10. The Commission's decision to wait until the 1984 proceeding to begin laying down rules for when it will consider requests for amortization seems especially reasonable given the fact that the 1983 proceeding marked the end of the first round of depreciation prescription orders implementing the remaining life rates adopted in Docket 20,188. *Id.* at 49,908. Thus Illinois Bell—unlike Southern Bell—had already tried remaining life rates for three years and been unsatisfied with the results. Similarly, in 1986 Southern Bell will have the opportunity to seek depreciation rates based on amortizing its depreciation deficits if it can convince the pertinent state commissions to concur, an effort the company is apparently undertaking with some success.

### III. CONCLUSION

■ Southern Bell's real complaint seems to be with Docket 20,188, not with the 1983 prescription order or even the decision in *Illinois Bell. See* Southern Bell Br. at 6–8; Southern Bell Reply Br. at 7–10. The company's allegation that the Docket 20,188 rulemaking did not consider the effects of competition on depreciation reserve deficiencies is, however, belied by the rulemaking decision itself. *See* 83 F.C.C.2d at 290; 87 F.C.C.2d at 918–19; *see also supra* at 212–13. Furthermore, if either Southern Bell or the

---

**9.** A Commission decision to make state commission concurrence a *sufficient* condition for allowing use of amortization would raise serious concerns that the FCC had abdicated its ratemaking responsibility to the states. The FCC made it clear in the *Illinois Bell* decision, however, that the states' position would only be a "significant factor" in its decisions on whether to allow amortization. 49 Fed.Reg. at 49,910. Indeed, in that very proceeding the Commission declined to accept Illinois Bell's proposal for applying Equal Life Group depreciation methods to embedded plant, contrary to Docket 20,-188, even though the Illinois Commerce Commission also supported that proposal. *Id.* at 49,909.

**10.** The Commission's emphasis on state commission evaluation of local competitive conditions and ratepayer impacts is consistent with its decision to preempt state decisions which impose

contrary depreciation ratemaking methodologies. *Amendment of Part 31,* 92 F.C.C.2d 864 (1983), *aff'd sub nom. Virginia State Corp. Comm'n v. FCC,* 737 F.2d 388 (4th Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 3497, 87 L.Ed.2d 629 (1985). The Commission's preemption decision was based on its conclusion that the inadequacies in the old methods of depreciation ratemaking and the deficits produced by those inadequacies were a problem of nationwide scope requiring uniform treatment. *Virginia State,* 737 F.2d at 392–95. By contrast, the specific decision about whether to allow accelerated amortization of reserve deficits for a given utility turns on an evaluation of whether bypass is more likely to occur in the near term or only in the future. *See supra* at 215–16. This evaluation must consider the differing competitive and regulatory conditions in each state, factors which the FCC found state commissions qualified to evaluate. 49 Fed.Reg. at 49,910.

intervenors in this case, *see supra* at 216 n.8, wish to question the wisdom of using remaining life depreciation rates in general, the appropriate forum is a new rulemaking before the Commission, not the appeal of an adjudication to this court.

The Commission's order prescribing depreciation rates for Southern Bell based on remaining life depreciation rate methods is affirmed. The petition for review is accordingly

*Denied.*